IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUSAN I. KELLEY f/k/a SUSAN I. LONG,  :
:  CIVIL ACTION
       Plaintiff,  :
:  NO. 08-2377
   v.  :
:
AMERISOURCEBERGEN CORP.,  :
:
       Defendant.  :

## MEMORANDUM

Jones, J.                                                                                                                    September 29, 2009

Before the Court is Defendant AmerisourceBergen Corporation's Motion for Summary Judgment (Doc. No. 11), Plaintiff Susan I. Kelly's Responses in Opposition thereto (Doc. Nos. 15 & 25), and Defendant's Reply (Doc. No. 19.)  For the following reasons, Defendant's Motion will be granted.

### I.  Summary of Relevant Procedural History

On May 21, 2008, Plaintiff filed a Complaint against Defendant AmerisourceBergen Corporation ("AmerisourceBergen") alleging that it violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601.  On August 8, 2008, Defendant filed an Answer to the Complaint. This case was reassigned to my docket on November 14, 2008.

On February 13, 2009, Defendant filed a Motion for Summary Judgment and a Statement of Undisputed Facts.  On March 12, 2009, Plaintiff filed a Response in Opposition to Defendant's Motion ("Response I").  This Response relied entirely on the allegation in Plaintiff's

Complaint and the admissions in Defendant's Answer; it did not point to any evidence in support of Plaintiff's claim.  Defendant filed a Reply on March 30, 2009.  May 26, 2009, Plaintiff filed a revised Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.  On May 27, 2009, Plaintiff filed a Revised Statement of Undisputed Material Facts.  None of Plaintiff's filings attach any exhibits in support of her FMLA claim.  Plaintiff's Revised Statement of Undisputed Material Facts refers to certain pages of deposition transcripts which have not been submitted to this Court as part of the summary judgment record.

**II.     Factual Allegations**

The Court recites the facts as viewed in the light most favorable to Plaintiff.

<u>Plaintiff's First Year at AmerisourceBergen</u>

Plaintiff Susan I. Kelley began working for AmerisourceBergen on June 5, 2006. (<u>See</u> Def.'s Mot. for Summ. J., Ex. C., Offer of At-Will Employment, May 2, 2006 ("Employment Offer"); Def.'s Mot. for Summ. J., Ex. A, Dep. of Susan I. Kelley ("Pl. Dep.") 47.)   Plaintiff's position was Inventory Clerk / Slot Info Clerk ("Slot Info Clerk") at Defendant's pharmaceutical distribution center in Bethlehem, Pennsylvania.  (Employment Offer; Pl. Dep. 47-48. )  In addition to Plaintiff, the Bethlehem distribution center employed two other Slot Info Clerks, Nehemias "Nick" Cruz and Suzanne Flick, and one Slot Info Specialist, Hope Chappelle.  (Pl. Dep. 51; Def.'s Mot. for Summ. J., Ex. D, Decl. of James Borthwick ("Borthwick Decl.") ¶ 5; Def.'s Mot. for Summ. J., Ex. B, Dep. of Elaine M. Marchese ("Marchese Dep.") 31).  Cruz began working at Defendant company on the same day as Plaintiff.  (Pl. Dep. 51; Marchese Dep. 21).  Flick began working at the company in February 2006.  (Marchese Dep. 21.)  Plaintiff,

Cruz, Flick, and Chappelle all reported directly to James Borthwick.  (Pl. Dep. 51; Borthwick Decl. ¶ 5.)

Plaintiff underwent periodic performance evaluations, which were conducted by Borthwick.  (Pl. Dep. 60.)  She underwent one such evaluation on September 6, 2006, after 90 days of employment.  (Pl. Dep. 60; Def.'s Mot. for Summ. J., Ex. E., Susan Long 90-Day Associate Review Form, Sept. 6, 2006 ("90-Day Review").)  In her 90-day evaluation, Plaintiff either fully met or exceeded four out of six performance expectations.  (90-Day Review at 1.)  Plaintiff partially met two of the performance expectations: learning and becoming proficient in tasks and processes and establishing an excellent attendance record.  (90-Day Review at 1.)  Overall, Plaintiff fully met the requirements of her position, and had "established herself as a reliable and positive member of the Slot Info team. . . [a]side from a few attendance issues. . . ."  (90-Day Review at 3.)  Plaintiff sat down and reviewed her evaluation with Borthwick.  (Pl. Dep. 60-61, 66-67.)  During that discussion, Plaintiff told Borthwick that she had been tardy because she had difficulty waking up due to personal issues, including that she was going through a divorce and assisting her parents.  (Pl. Dep. 67; Borthwick Decl. ¶¶ 12-13.)  At that time, Plaintiff was not aware of any need for time off from work.  (Pl. Dep. 67.)

On January 31, 2007, Plaintiff was given corrective action, in the form of a verbal counseling, for being tardy to work on thirteen (13) occasions in January 2007, based on the time Plaintiff had logged in on the time clock. (Def.'s Mot. for Summ. J., Ex. F, Corrective Action, Susan Long, Jan. 31, 2007 ("Pl.'s 1/13/07 Corrective Action"); Marchese Dep. 38; Pl. Dep. 76.)  This corrective action was documented in writing, and Plaintiff signed the corrective action form on February 2, 2007, after meeting with Borthwick and Elaine Marchese, the Human Resources

Manager of the Bethlehem facility.  (Pl.'s 1/13/07 Corrective Action; Marchese Dep. 6, 38-39; Pl. Dep. 76-78.)   Plaintiff was informed that she must display an immediate improvement in overall attendance, and that failure to improve could result in additional disciplinary measures, up to and including dismissal.  (Pl.'s 1/13/07 Corrective Action.)  Borthwick and Marchese told Plaintiff that her tardiness was unacceptable, and, since she was tardy only by minutes, they could not understand why she could not leave home ten minutes earlier.  (Pl. Dep. 78.)  Plaintiff did not disagree with Borthwick and Marchese; she acknowledged that they had a legitimate complaint about her tardiness.  (Pl. Dep. 78.)  During the meeting, someone read to Plaintiff a company policy regarding tardiness.  (Pl. Dep. 80, 92.)  That policy may have been included in the handbook that Plaintiff received during her first week of employment.  (Pl. Dep. 92.)  Under normal circumstances, Plaintiff would have been terminated for so many incidences of tardiness, but Borthwick chose to give her a verbal counseling instead.  (Marchese Dep. 39-40.  See also Def.'s Mot. for Summ. J., Ex. H, AmerisourceBergen Attendance Policy at 2 (stating that an associate will be terminated for twelve latenesses of five minutes or more within one year, and that continual tardiness of 5 minutes or less will be addressed on a case-by-case basis).)

After February 2, 2007, Plaintiff was tardy to work on other occasions.  (Pl. Dep. 82.)  On April 17, 2007, she was given a second corrective action, this time in the form of a written warning, for tardiness.  (Pl. Dep. 79-80; Def.'s Mot. for Summ. J., Ex. G, Corrective Action, Susan Long, April 17, 2007 ("Pl.'s 4/17/07 Corrective Action").)  The corrective action form stated that Plaintiff had occurrences of tardiness of five minutes or greater on March 26, April 2, and April 11 of that year, and that she had continued to be tardy for five or fewer minutes through the first two quarters of 2007.  (Pl.'s 4/17/07 Corrective Action.)  On April 18, 2007,

Plaintiff met with Borthwick and Marchese to discuss this corrective action and was told that failure to improve could lead to disciplinary measures or termination. (Pl. Dep. 79-81).

On May 14, 2007, Plaintiff met with Borthwick to discuss her year-end performance evaluation. (Pl. Dep. 70-71; Def.'s Mot. for Summ. J., Ex. I, Performance Management - Warehouse Associates for Susan Long, May 14, 2007 ("Pl.'s Year-End Evaluation"); Marchese Dep. 11.) Plaintiff received mixed reviews in this evaluation. (See Pl.'s Year-End Evaluation.) For instance, in the Initative section, Borthwick commented that Plaintiff "display[ed] an eagerness to learn new skills, and take on additional responsibilities. As priorities change, however, Susan tends to respond negatively to feedback or suggestions." (Pl.'s Year-End Evaluation at 1.) In the Quality of Work section, Borthwick commented that Plaintiff "has struggled with maintaining an acceptable attendance record during the rated period [and] was issued a Verbal Warning for tardiness on 1/31/07." (Pl.'s Year-End Evaluation at 1.) Plaintiff's overall rating was "partially meets expectations." (Pl.'s Year-End Evaluation at 2.) Plaintiff signed the third page of the year-end performance evaluation on May 14, 2007, but she never saw the first two pages of the document. (Pl. Dep. 70; Pl.'s Year-End Evaluation at 3.) Borthwick did Plaintiff's review by talking to her with a laptop in front of him, while typing things into the computer. (Pl. Dep. 70.) However, Plaintiff and Borthwick did discuss the contents of the evaluation. (Pl. Dep. 74.) In addition, on several occasions, Plaintiff expressed to Borthwick her unhappiness with the word "attendance" in her evaluation. (Pl. Dep. 71.) Although Plaintiff had problems with tardiness, she always attended work. (Pl. Dep. 71.)

<u>August 2007: Plaintiff's FMLA Leave and Termination</u>

On Friday August 3, 2007, at the end of a week-long vacation, Plaintiff telephoned

Marchese and said that Plaintiff's father was seriously ill and had been placed in hospice care earlier that week. (Pl. Dep. 99.) Plaintiff asked to use her two remaining vacation days on August 6 and 7. (Pl. Dep. 99; Marchese Dep. 14-15.) Plaintiff also informed Marchese that she would be applying for FMLA leave to care for her father. (Pl. Dep. 99; Marchese Dep. 11-12.) Plaintiff received the two requested vacation days. (Pl. Dep. 99-100; Marchese Dep. 15.) She also met with Marchese on August 7 to get paperwork for the FMLA leave, which included the name and contact telephone number for MetLife Insurance Company, the administrator of FMLA leave for AmerisourceBergen. (Pl. Dep. 99-100; Marchese Dep. 12-13.) On August 7, Marchese explained to Plaintiff that she would be responsible for paying healthcare premiums while on FMLA leave and that she would be required to report to Marchese each month with an update on her FMLA status. (Pl. Dep. 101; Def.'s Mot. for Summ. J., Ex. J, Heath Insurance Premium Statement, Aug. 7, 2007.) On August 7 or August 8, Plaintiff telephoned MetLife to apply for FMLA leave in order to care for her father. (Pl. Dep. 101, 107; Marchese Dep. 14.) MetLife sent Plaintiff a letter, dated August 8, 2007, confirming her request for FMLA leave to care for a family member and enclosing the Health Care Provider Certification Form that needed to be completed. (Pl. Dep. 107; Def.'s Mot. for Summ. J., Ex. K, Letter from MetLife to Plaintiff, Aug. 8, 2007.) She received the form on August 9, 2007. (Pl. Dep. 110.) Her father signed the form on August 10, 2007. (Pl. Dep. 109.)

     Plaintiff's father passed away on August 12, 2007. (Pl. Dep. 112,) As the family was leaving the funeral home before Plaintiff's father's cremation, Plaintiff's mother fell and hurt her knee. (Pl. Dep. 111.) On August 13, 2007, Plaintiff called MetLife and sought to extend her FMLA claim in order to care for her mother. (Pl. Dep. 111-12, 115-16.) Plaintiff received verbal

approval due to the urgent nature of the claims. (Pl. Dep. 123.) MetLife sent Plaintiff another set of forms, for Plaintiff's father and mother. (Pl. Dep. 112, 116, 119.) On August 14, 2007, a doctor completed the Health Care Provider Certification for leave covering the care of Plaintiff's father and mother from August 8, 2007, through September 6, 2007. (Pl. Dep. 111-16; Def.'s Mot. for Summ. J., Ex. M, Health Care Provider Certification.) Plaintiff signed and returned the forms to MetLife on August 15, 2007. (Pl. Dep. 111, 123.)

On August 14, 2007, Marchese telephoned Plaintiff and asked her to come into the office to discuss something important. (Pl. Dep. 126.) Ms. Marchese wanted to explain to Ms. Kelley, in person, that her job was being eliminated and that she was being laid off. (Marchese Dep. 18; Def.'s Mot. for Summ. J., Ex. Q, Decl. of Elaine Marchese ("Marchese Decl.") ¶ 19.) Plaintiff told Marchese that she could not come in because her father had recently passed away. (Pl. Dep. 126; Def.'s Answer ¶ 15.)[1] When Plaintiff asked what Marchese wanted to discuss, Marchese responded, "I will not discuss this with you over the phone. If you're not going to come in as requested, I will mail you a letter." (Pl. Dep. 127. See also Pl. Dep. 131; Marchese Dep. 34-36; Marchese Decl. ¶¶ 20-21.) During that conversation, Plaintiff also requested bereavement leave. (Pl. Dep. 127.) Marchese granted Plaintiff three days paid bereavement leave. (Marchese Dep. 35-36.)

On August 16, 2007, Marchese sent an explanatory cover letter and a Severance Letter and General Release to Plaintiff via registered mail. (Marchese Decl. ¶ 22; Marchese Dep. 36; Def.'s Mot. for Summ. J., Ex. W, Letters from Def. to Pl., Aug. 16, 2007 ("Termination

---

[1] The Parties dispute whether Plaintiff and Marchese had one or two telephone conversations on or about August 14, 2007, and they dispute whether these conversations took place on August 14 or August 15, 2007. The Court defers to Plaintiff's version of the facts.

Letters").)   The letters stated that Plaintiff's employment was terminated effective August 17, 2007, with her last day of work being July 27, 2007.  (Termination Letters.)   The letters also stated that Plaintiff was being offered a severance package in exchange for her release of any claims of employment discrimination.  (Termination Letters; Marchese Dep. 36.)  The August 16, 2007, Letters were standard letters and did not reference the reason for Plaintiff's termination.  (Marchese Dep. 34-35, 37-38.)  Typically, Marchese speaks with employees face to face when they get laid off because the news is uncomfortable to hear over the telephone.  (Marchese Dep. 34-35, 37-38.)

On August 20, 2007, Plaintiff telephoned Defendant's corporate office regarding her termination and spoke to someone named Ms. Catona.  (Pl. Dep. 131, 136.)  Plaintiff complained to Ms. Catona that she had been terminated while she was on FMLA and bereavement leave.  (Pl. Dep. 136, 156-57; Marchese Decl. ¶ 25.)  Plaintiff did not ask Ms. Catona why she had been terminated.  (Pl. Dep. 136.)  On no occasion did Plaintiff ask Marchese or anyone else at AmerisourceBergen why she had been terminated.  (Pl. Dep. 137-38, 156-57, 162; Marchese Dep. 47.)

Plaintiff was approved to take FMLA leave to care for her father and her mother.  (Pl. Dep. 177-78; Marchese Dep. 14-15.) (Pl. Dep. 177-78;)[2]  Plaintiff received two letters from MetLife approving her claim to care for her father.  (Pl. Dep. 119; Def.'s Mot. for Summ. J., Ex. N, Letters from MetLife to Plaintiff, Aug. 22, 2007, Claim No. FM0708070309 ("August 22

---

[2] Plaintiff was approved for leave through September 6, 2007, but the end date of her leave was modified to August 16, 2007, due to her termination.  (Pl. Dep. 178.)

Letters").)³ Defendant received a copy of these FMLA approval letters. (Def.'s Answer ¶¶ 27, 29.) Ms. Kelley received another letter from MetLife approving her FMLA claim to care for her mother from August 13 through September 6, 2007. (Def.'s Mot. for Summ. J., Ex. O, Letter from MetLife to Plaintiff, Aug. 24, 2007, Claim No. FM0907221971.) Defendant received a copy of this letter as well. (Def.'s Answer ¶ 36.) On September 10, 2007, MetLife sent Plaintiff a letter stating that they had modified her FMLA to August 13 through August 16, 2007, because her employment had been terminated. (Pl. Dep. at 123-124; (Def.'s Mot. for Summ. J., Ex. P, Letter from MetLife to Plaintiff, Sept. 10, 2007.)

No one from Defendant company ever told Plaintiff that she was not allowed to take FMLA leave. (Pl. Dep. 177.) No one ever complained about Plaintiff's use of FMLA leave or told her that she should not take FMLA leave. (Pl. Dep. 177.) Other than the FMLA documents that state that her job would be protected, Plaintiff has no additional reason to believe that she was retaliated against for taking FMLA leave. (Pl. Dep. 177.) In her deposition, Plaintiff stated, "I don't even know if it was retaliation. I just know I was fired while I was on FMLA." (Def.'s Mot. For Summ. J., Ex. 1, Dep. of Susan I. Kelley ("Pl. Dep. II") 181.)

On August 22, 2007, Plaintiff signed the explanatory letter that had accompanied the Severance Letter, acknowledging receipt of the same. (Termination Letters.) She did not accept the Release or the associated severance package. (Pl. Dep. at 153; Marchese Dep. 37.)

<u>AmerisourceBergen's Reasons for Plaintiff's Termination</u>

When Defendant's Bethlehem distribution center opened in April or May 2006,

---

³ One letter stated that Plaintiff's FMLA leave was approved for August 8 through August 12, 2007, and the second stated that due to the death of her eligible family member, her leave was modified to August 8 through August 10, 2007. (August 22 Letters.)

recommendations were provided for how many employees the facility would need. (Marchese Decl. ¶¶ 5-6.) Approximately one year later, Defendant realized that the facility did not need as many employees as originally projected and started looking to make cuts. (Marchese Decl. ¶ 7; Marchese Dep. 28.) In June 2007, Defendant's WorkInfo Team, which develops job standards and evaluates efficiencies and redundancies, completed a study of the Bethlehem facility, concluded that the facility was overstaffed in many areas, and recommended that the facility be downsized. (Marchese Decl. ¶¶ 8-9. See also Def.'s Mot. for Summ. J., Ex. R, E-mails between Marchese and Jane Spreter, June 21, 2007 ("June 21, 2007, E-mails") (discussing layoffs).) Between June and August 2007, Marchese discussed the proposed layoffs with a the Operations Team, which consisted of Marchese, Vice President / Distribution Center Manager Bill Brillhart, and Bethlehem Distribution Center Operations Manager Andy Squire. (Marchese Decl. ¶ 10; Borthwick Decl.¶ 20; June 21, 2007, E-mails; Def.'s Mot. for Summ. J., Ex. R, E-mail from Marchese to Brillhart, July 9, 2007; Def.'s Mot. for Summ. J., Ex. S, Decl. of Andy Squire ("Squire Decl.") ¶¶ 4, 8.)

Between August 1 and August 10, 2007, AmerisourceBergen laid off an Administrative Assistant, a Receiver, and an Order Filler from the Bethlehem facility. (Marchese Decl. ¶ 11.) Operations Team also decided to eliminate one Slot Info position, and Borthwick informed the Operations Team that the Slot Info group could function with one less member without suffering adverse effects. (Borthwick Decl. ¶¶ 21-22; Squire Decl. ¶ 9; Marchese Decl. ¶ 11.)[4] The Bethlehem Facility Human Resources office was charged with determining which Slot Info

---

[4] In July 2007, Borthwick had informed Plaintiff and other staff persons that their jobs were not in jeopardy. (Pl. Dep. 156.)

associate to lay off, based upon performance evaluations, corrective actions, and attendance records.  (Borthwick Decl. ¶ 23; Squire Decl. ¶ 10.)  Marchese called an Operations Team meeting to discuss the employee records of the three Slot Info Clerks: Plaintiff, Cruz, and Flick.  (Squire Decl. ¶ 10; Marchese Decl. ¶ 14.)  Marchese and Squire decided that Plaintiff should be laid off because the records demonstrated that she was the weakest performer in the group and had received the most corrective actions.  (Borthwick Decl. ¶ 24; Squire Decl. ¶ 11; Marchese Decl. ¶¶ 15, 18.)  They communicated this decision to Brillhart and Jane Spreter, Regional Director of Human Resources, who approved of the decision. (Marchese Dep. 49-50; Marchese Decl. ¶ 18).  Plaintiff's performance evaluations were lower than those of Cruz and Flick, who had both received ratings of "fully meets expectations."  (Borthwick Decl. ¶ 25; Marchese Decl. ¶ 15; Marchese Dep. 31; Def.'s Mot. for Summ. J., Ex. U, Performance Management - Warehouse Associates for Suzanne Flick, May 14, 2007; Id., Performance Management - Warehouse Associates for Nehemias Cruz, May 14, 2007.)  Further, Plaintiff had received two corrective actions for excessive tardiness, while Cruz had received no corrective actions and Flick had received only one corrective action.  (Borthwick Decl. ¶ 25; Marchese Decl. ¶ 16; Def.'s Mot. for Summ. J., Ex. U, Corrective Action, Suzanne Flick, Aug. 3, 2007.)  These records were the sole determinant of the Operations Team's decision to lay off Plaintiff. (Marchese Decl. ¶ 17.)

     Between August 7 and August 9, 2007, Marchese had conferred with Spreter concerning the lawfulness of laying off employees who were on FMLA or short-term disability.  (Marchese Dep. 47-49, 55-57; Def.'s Mot. for Summ. J., Ex. V, E-mails between Marchese and Spreter, Aug. 7-9, 2007 ("Spreter E-mails").)  Spreter informed Marchese that she would have to show

why those employees were selected for elimination, unless they were the only persons in their respective positions. (Spreter E-mails.) Spreter also told Marchese that, in her understanding, the FMLA and short-term disability do not offer any protection against a position being eliminated. (Spreter E-mails.)

Defendant implemented additional layoffs in September and October of 2007, including three Receivers, one Stocker, and one Cage Vault Clerk from the Bethlehem facility. (Marchese Decl. ¶¶ 26-27.) A couple of months after Plaintiff was laid off, Cruz was laid off from his position after management decided that the Bethlehem facility needed only one Slot Info Clerk. (Marchese Decl. ¶ 28; Marchese Dep. 50-51.) For that lay off, Marchese used the same process she had used in August 2007 to determine who would be terminated. (Marchese Dep. 51.) Between July 1, 2007, and June 30, 2008, AmerisourceBergen laid off 18 employees from the Bethlehem facility. (Marchese Decl. ¶ 29.) Defendant has not posted job openings for Slot Info Clerks at its Bethlehem facility at any time since Plaintiff's termination. (Marchese Dep. 53.)

<u>Events Subsequent to Plaintiff's Termination</u>

Plaintiff applied for unemployment compensation on August 19, 2007. (Pl. Dep. 146.) Marchese received notification of that application from Defendant's unemployment insurance administrator, TALX. (Marchese Dep. 45.) Marchese responded to TALX, stated that Defendant did not wish to contest Plaintiff's claim, and wrote that the reason for separation was "Job Elimination – Associate Severanced." (Marchese Dep. 45; Def.'s Mot for Summ. J., Ex. X, TALX Info Request for Separation.) On a document from the Pennsylvania unemployment insurance office, Marchese wrote that Plaintiff was "severanced" from AmerisourceBergen because of a staff reduction, meaning she was laid off and offered a severance package.

(Marchese Dep. 45-46; Def.'s Mot for Summ. J., Ex. Y, Employer's Notice of Application, Request for Separation and Wage Information, Aug. 22, 2007.)

On September 10, 2007, Plaintiff received a call from an unemployment claims investigator. (Pl. Dep. 150, 157.) The claims investigator said that she had contacted Defendant company, who stated that there was work slowdown at the distribution center that resulted in a lack of work and employee layoffs. (Pl. Dep. 150, 153, 162.) Plaintiff responded that she was unaware of any work slowdown or work stoppage, and that her termination letter did not provide the reason for her termination. (Pl. Dep. 153, 157.) Plaintiff's unemployment claim was approved. (Pl. Dep. 157.)

**III.   Standard of Review**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23. An issue is genuine if the fact

finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. Anderson, 477 U.S. at 248. In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." Seigel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).

IV.   Discussion

The FMLA grants eligible employees the right to take up to 12 workweeks of leave in any 12-month period "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). In most cases, after a period of qualified leave, an employee is entitled to reinstatement to her former position or an equivalent position with pay and benefits. 29 U.S.C. § 2614(a)(1); Sommer v. The Vanguard Group, 461 F.3d 397, 399 (3d Cir. 2006). However, as the Third Circuit has written,

> This right to reinstatement is qualified by a statutory directive that it does not entitle a restored employee to a right, benefit or position to which the employee would not have been entitled had the employee not taken the leave. Thus, for example, if an employee is discharged during or at the end of a protected leave for a reason unrelated to the leave, there is no right to reinstatement.

Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004) (internal quotation and citations omitted); 29 U.S.C. § 2614(a)(3)(B). In other words, "The FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA." Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 403 (3d Cir. 2007).

It is unlawful for an employer to interfere with, restrain, or deny an employee's exercise of or attempt to exercise her FMLA rights. 29 U.S.C. § 2615(a)(1). A claim under Section 2615(a)(1) of the FMLA is referred to as an "interference" claim. Sommer, 461 F.3d at 399. To state an FMLA interference claim, a plaintiff must show that she "was entitled to benefits under the FMLA and that [her] employer illegitimately prevented [her] from obtaining those benefits." Sarnowski, 510 F.3d at 401 (quoting Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)). "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Callison, 430 F.3d at 120. "Because the FMLA is not about discrimination, a McDonnell Douglas burden-shifting analysis is not required" for an FMLA interference claim. Sommer, 461 F.3d at 399.

It is also unlawful for an employer to retaliate against an employee for exercising her rights under the FMLA. Callison, 430 F.3d at 119, 120; 29 U.S.C. § 2615(a)(1) and (2); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees ... who have used FMLA leave."). "Employers may not 'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" Callison, 430 F.3d at 119 (quoting 29 C.F.R. § 825.220(c)). See Conoshenti, 364 F.3d 135 at 147 n.9 (discussing the different approaches the circuit courts of appeals have taken to analyze FMLA retaliation claims and noting that "retaliation for taking an FMLA leave does not come within the literal scope of the sections of the FMLA directed to retaliation"). Firing an employee for a valid request for FMLA leave may constitute interference and retaliation in violation of the FMLA. Erdman v. Nationwide Ins. Co., --- F.3d ----, slip. op., 2009 WL 3018116, *8 (3d Cir. Sept. 23,

2009).

In an unpublished opinion, a Third Circuit panel held that the McDonnell Douglas burden-shifting framework applies to FMLA retaliation claims.  Parker v. Verizon Pennsylvania, Inc., 309 Fed.Appx. 551, 555 (3d Cir. Feb. 4, 2009); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   Under this framework, the plaintiff bears the burden of establishing a prima facie case of discrimination.  If the plaintiff does so successfully, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  If the defendant meets its burden of production, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reason was a pretext for discrimination.  McDonnell Douglas, 411 U.S. at 802.  To establish a prima facie case of retaliation under the FMLA, a plaintiff  must show that (1) she took FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her use of FMLA leave.  Conoshenti. 364 F.3d at 146.

Plaintiff claims that Defendant interfered with her rights under the FMLA and that Defendant terminated her in retaliation for her use of FMLA leave.  It is undisputed that Plaintiff was allowed to and did take FMLA leave.  However, Plaintiff's FMLA leave was abbreviated due to her termination.  Still, Plaintiff cannot support an FMLA termination or retaliation claim because she has not shown that her termination was causally related to her use of FMLA leave.

Plaintiff's FMLA interference and retaliation claims both appear to be based on the fact that she was terminated while on FMLA leave.  Such a termination is not illegal unless it was made because of Plaintiff's exercise of her FMLA rights.  Apart from evidence that she was terminated during her FMLA leave, Plaintiff has presented no evidence whatsoever to indicate

that she was terminated and her FMLA leave was shortened *because* she exercised her FMLA rights. Even if the timing of her termination sufficed to support a prima facie case of retaliation, Plaintiff has failed to present one scintilla of evidence to rebut Defendant's numerous exhibits in support of its legitimate non-discriminatory reason for Plaintiff's termination: that Plaintiff was terminated as part of a workforce reduction at the Bethlehem facility and that Defendants' decision to terminate Plaintiff, rather than one of the other Slot Info Clerks, was made based on Defendants' comparison of the three Slot Info Clerks' employment records and Defendant's conclusion that Plaintiff had the worst record of the three. The fact that Plaintiff was unaware of workforce reductions does not dispute the evidence that such a reduction took place.

The Court has engaged in an exhaustive review of the facts, in the light most favorable to Plaintiff, and concludes that no reasonable jury could find in Plaintiff's favor. Plaintiff has failed to establish a prima facie case of FMLA interference or retaliation. There is no genuine issue of material fact regarding the reasons for Plaintiff's termination. The record clearly indicates that Plaintiff was terminated for reasons unrelated to FMLA leave.

## V.     Conclusion

For the foregoing reasons, summary judgment will be granted in favor of AmerisourceBergen and against Plaintiff. An appropriate Order follows.